AO-106 (Rev. 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

**FILED**

OCT 11 2024

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of<br>*Face & Body Medical Aesthetics,*<br>*6304 E. 102nd St., Tulsa, OK 74137* | )<br>)<br>)<br>)<br>) |

Case No. 24-MJ-641-SH

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **21 U.S.C. § 841(a)(1)** | **Distribution of Controlled Substances** |

The application is based on these facts:

**See Affidavit of TFO John Morrison, HSI, attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO John Morrison, HSI
*Printed name and title*

Subscribed and sworn to by phone.

Date: 10/11/24

City and state: Tulsa, Oklahoma

_____
*Judge's signature*

Susan E. Huntsman, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

**In the Matter of the Search of**
**Face & Body Medical Aesthetics,**
**6304 E. 102nd St., Tulsa, OK 74137**

Case No. _____

**FILED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, John Morrison, a Task Force Officer with Homeland Security Investigations (HSI), being duly sworn, declare and state as follows:

### Introduction and Agent Background

1.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search Face & Body Medical Aesthetics, 6304 E. 102nd St., Tulsa, Oklahoma, 74137, as further described in Attachment A, for the things described in Attachment B.

2.   I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws, and I am within the category of officers authorized by the Attorney General to request such a warrant.

3.   I have been employed as a Narcotics Agent with the Oklahoma Bureau of Narcotics since March of 2012. As a result of my employment with the Oklahoma

Bureau of Narcotics, my duties include, but are not limited to, the investigation of the Diversion of Narcotics occurring in the Northern District of Oklahoma.

4. As part of my duties as a Narcotics Agent, I investigate criminal violations relating to various drug offenses, to include 21 U.S.C. § 841(a)(1).

5. I am a Task Force Officer with Homeland Security Investigations (HSI). I have been a Peace Officer since January of 2001. I began my career with the Overland Park, Kansas Police Department and worked there as a certified Peace Officer until January of 2004. I then moved to the Muskogee, Oklahoma Police Department in January of 2004 and worked there as a certified Peace Officer until March of 2012. I am currently employed by the Oklahoma Bureau of Narcotics and Dangerous Drugs Control (hereinafter OBN) as a full-time Peace Officer and Narcotics Agent, and I have been so employed since March 19, 2012. Currently, I am assigned to the OBN Tulsa District Office where I serve as the Captain over the Diversion Unit.

6. While working as a certified Peace Officer, I have spent more than eleven years working in patrol, and I am currently a narcotics investigator with more than seven years of experience in this area. In addition to those duties, I have served as a member of the Muskogee Police Department's Special Operations Team and as a Field Training Officer. In 2007, I earned an instructor certification through the Oklahoma Council on Law Enforcement Education and Training (C.L.E.E.T), and I am currently an adjunct Defensive Tactics Instructor.

7.   I have attended over 1,800 hours of continuing education and training during my law enforcement career. I have attended training specific to the investigation of illegal drug offenses provided by C.L.E.E.T., OBN, DEA, the Midwest Counterdrug Training Center, the Muskogee Police Department, and the Association of Oklahoma Narcotic Enforcers (AONE). I have participated in courses relating to narcotics investigation such as Undercover Survival, Narcotics Air Assault School, the OBN Narcotics Investigators School, Criminal Interdiction, and the search of electronic devices.

8.   I have conducted hundreds of investigations involving drug crimes to include unlawful manufacturing, distribution, possession of controlled dangerous substances and conspiratorial activity related to the same. During my career, I have participated in hundreds of interviews with victims, suspects, arrestees, witnesses, cooperating individuals, and informants. Through these interviews, I have been informed of the various aspects/practices related to the regular activities of the illicit drug business and the operations related thereto. I have written, planned, and executed search warrants, and have testified under oath in court. Through this training and experience, I have become especially familiar with the techniques and operations of those involved in the drug trade and their day-to-day activities.

9.   My experience includes, but is not limited to, patrol, investigations, conducting physical surveillance, and executing search warrants relating to a myriad of offenses including drug crimes. I have also acted in an undercover capacity where I have purchased drugs and engaged in hand-to-hand transactions with drug dealers.

3

I have consulted with other experienced officers in narcotics investigations, and I have worked with other local, state, and federal law enforcement agencies.

10.   I have been the case agent in the investigation of large-scale drug conspiracies involving the distribution of hundreds of pounds of methamphetamine. During those investigations, I have written, assisted in the preparation of, and executed hundreds of search warrants and pen registers, and I have received authorization from the Oklahoma Court of Criminal Appeals and the United States District Courts for the Eastern and Northern Districts of Oklahoma to conduct wire intercepts of cellular telephones.

11.   As a supervisor at OBN, I am responsible for reviewing reports relating to diversion investigations. Diversion refers to distribution of controlled substances in violation of state and federal laws. In the State of Oklahoma, to prescribe, administer, or dispense controlled substances, an individual must obtain a valid registration through OBN. The State of Oklahoma has approximately 30,000 registrants. OBN is tasked with ensuring each registrant is properly guarding against diversion and is properly storing, administering, and prescribing controlled substances. As an agent with OBN, I have participated in several cases involving diversion and have used a variety of investigative techniques while doing so. Those activities include but are not limited to: on-site inspections of registrants, interviews of witnesses and suspects involved in diversion investigations, acting in an undercover capacity and purchasing diverted prescription tablets, conducting surveillance of suspects and facilities involved in diversion, and assisting in

4

investigations regarding what is commonly referred to as "pill mills" – businesses posing as legitimate medical facilities but that are involved in the illegal distribution of opioids to patients for profit. As a supervisor, I consult with the investigating agent(s) and assist them in completing their investigations involving both administrative and criminal filings. I have also attended specific training as it relates to diversion. This training includes investigations of medical professionals and practices, and overdose deaths.

12.   I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on information provided by other law enforcement officers and on my personal observations and training and experience as an Agent for OBN.

13.   As the Captain over the Diversion Unit, I was the supervisor overseeing the investigation of Dr. Ladd Atkins' practice at FACE & BODY MEDICAL AESTHETICS (FACE & BODY) located at 6304 East 102nd Street Tulsa. I have conducted surveillance, reviewed reports prepared by other law enforcement officers, and have participated in several undercover operations related to this investigation, including reviewing the undercover audio and video recordings. Because this affidavit is being submitted for the limited purpose of securing a Search Warrant, I have not included each and every fact known concerning this investigation. I have set forth only the facts that I believe are necessary to show probable cause for the issuance of a Search Warrant for the location and seizure of evidence showing that Ladd Atkins, D.O., and others at Face & Body located at 6304 East 102nd Street in

5

Tulsa, Oklahoma have been and continue to be engaged in criminal activities in violation of federal laws contained in Title 21 of the United States Code.

14.   Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of 21 U.S.C. § 841(a)(1) will be located at Face & Body 6304 E. 102nd St. Tulsa, Oklahoma, as further described in Attachment A.

### Jurisdiction

15.   "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a. Venue is proper because the person or property described in this affidavit is within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

### Probable Cause

16.   In November of 2023, the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBN) Tulsa District Office initiated an investigation of Ladd Atkins, D.O., a practicing physician/surgeon of Face & Body. Face & Body is owned by Cosmetic Center of Tulsa, LLC, which lists an owner address of 10617 South Winston Court, Tulsa, 74137. The address of 10617 South Winston Court has listed owners: Antonio Eloisa & Kristina Balaram Parchuri, and Ttees Antonia Eloisa Parchuri. This information was obtained from the Tulsa County Assessor's property records website.

6

17.   The investigation was initiated based on a complaint submitted to OBN on November 17, 2023. The complaint alleged that Dr. Atkins hired Amanda Robison ("Robison") in July 2023 to practice as a nurse when he knew that her license to practice as a nurse was restricted by the Oklahoma Board of Nursing. The complaint alleged that Dr. Atkins allowed Robison to perform nursing duties from July 2023 to September 2023, which included Robison independently treating patients, performing procedures, and prescribing and refilling narcotics and Class II and III Scheduled Substances, including Testosterone, Adderall, & opiates. The complaint alleged that Dr. Atkins knew when he hired Robison that the Nursing Board had restricted Robison's APRN license, and she was not permitted to Robison see and treat patients independently.

18.   Ladd Clayton Atkins is a Doctor of Osteopathic Medicine (D.O.), and the only physician/surgeon at Face & Body. The Oklahoma State Board of Osteopathic Examiners (OSBOE) issued medical license number 4362 to Dr. Atkins on March 16, 2006. Dr. Atkins holds a controlled substance license through the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD), license number 34415. Dr. Atkins has held this license since 2013. Dr. Atkins holds DEA Registration number BA9720649.

### Robison's APRN/Nursing License Status

19.   Robison was licensed to practice registered nursing in the State of Oklahoma and was the holder of a single-state registered nursing license, License No. R0085899 issued by the Oklahoma Board of Nursing ("Board"). Before 2021,

Robison had a national certification to practice as a Certified Nurse-Practitioner in Family, Certification No. Fl 014156 in the specialty role of family. She was licensed by the Oklahoma Nursing Board as an advanced practice registered nurse-certified nurse practitioner ("APRN-CNP"). Her prescriptive authority recognition was granted on November 6, 2014, and lapsed on April 1, 2022. Robison had been an APRN until her arrest in 2021 (see below).

20.     On February 7, 2022, Robison submitted to the Oklahoma Board of Nursing a RN Renewal Application ("Application") to practice single-state registered nursing. On that application, Robison falsified the Application when checking "No. None of the above apply" to the following question:

> Have you been charged and/or convicted in any criminal offense not previously reported in writing to the Oklahoma Board of Nursing, including those pending appeal? (You may exclude minor traffic violations, but must report all DUI/DWI charges and/or DUI/DWI convictions) Check all that apply:

According to my review of the Nursing Board documents generated in the course of this investigation, including Nursing Board findings, Robison's answer was false as she failed to disclose that she was charged in Tulsa County District Court in Case Nos. CF-2021-3562 and CF-2021-4425 (see below).

21.     On March 2, 2022 Robison submitted to the Oklahoma Board of Nursing an APRN-CNP Renewal Application ("APRN Renewal Application"). Robison

8

again falsified the APRN Renewal Application when checking "No. None of the above apply" to the following question:

> Have you been charged and/or convicted in any criminal offense not previously reported in writing to the Oklahoma Board of Nursing, including those pending appeal? (You may exclude minor traffic violations, but must report all DUI/DWI charges and/or DUI/DWI convictions) Check all that apply:

22.    According to the Nursing Board findings, Robison's answer was false as she failed to disclose Case Nos. CF-2021- 3562 and CF-2021-442.

23.    On April 11, 2022, the State Surgeon General for the State of Florida Board of Nursing filed an Administrative Complaint citing the Respondent's District Court of Tulsa County, Oklahoma felony convictions. On October 28, 2022, the State of Florida Board of Nursing issued a Final Order revoking the Respondent's license to practice as an advanced practice registered nurse in Florida.

24.    On November 22, 2022, Robison submitted to the Oklahoma Board of Nursing an APRN Prescriptive Authority Reinstatement Application. Robison again falsified the APRN Prescriptive Authority Reinstatement Application when checking "No. None of the above apply" to the following question:

> Have you been charged and/or convicted in any criminal offense not previously reported in writing to the Oklahoma Board of Nursing, including those pending appeal? (You may exclude minor traffic violations, but must report all DUI/DWI .charges and/or DUI/DWI convictions) Check all that apply:

9

Once again, Robison's answer was false as she failed to disclose Tulsa County Case Nos. CF-2021- 3562 and CF-2021-4425.

25.    On July 11, 2023, the Nursing Board held a hearing. Robison waived statutory notice requirements and voluntarily elected not to appear before the Board. After the hearing, the Nursing Board made the following findings:

> Respondent has requested a referral to the Board's Peer Assistance Program.
>
> Respondent's APRN Prescriptive Authority Reinstatement Application is denied.
>
> Respondent is referred to the Peer Assistance Program of the Oklahoma Board of Nursing with the following terms and conditions:
>
> Respondent's single-state license to practice registered nursing and license as an APRN-CNP are hereby <u>temporarily suspended</u> as of the date of this Order, which temporary suspension shall be set aside provided Respondent provides documentation, satisfactory to the Board, of Respondent's acceptance into the Peer Assistance Program within sixty (60) days from receipt of this Order.
>
> If Respondent is not accepted into the Peer Assistance Program within sixty (60) days of receipt of this Order or having been accepted is terminated/defaults from the Program for any reason other than successful completion of Respondent's contract, amended contract(s) and treatment plan, Respondent's licenses are hereby revoked for a period of two (2) years from the date of non-acceptance in the Program or the date of the termination/default from the Program.

> Upon acceptance to the Peer Assistance Program, Respondent's single-state license to practice registered nursing and license as an APRN-CNP shall be marked "Active- Conditions-Peer Assistance."

26.   On September 19, 2023, Robison signed a Peer review Assistance Program Contract [PAPC] in which she specifically agreed to:

   i.   "refrain from nursing practice until such time as I meet the Return to Professional Nursing Practice Criteria of the Program, and this Contract has been amended to allow me to resume nursing practice...." and

   ii.   inform current and prospective employers of my participation in the Program...."

27.   Dr. Ladd Atkins signed the Employer Acknowledgment document on September 20, 2023, in which he acknowledged that:

   i.   Robison informed him of his admission into the OK Peer Assistance program;

   ii.   Robinson has agreed to refrain from handling controlled substances and has agreed to refrain from working in any role that requires a nursing license until such time as her/his [PAPC] is amended in writing to allow the resumption of handling narcotics and/or nursing practice.

28.   My investigation has determined that Robison's contract was not amended to allow for the resumption of the duties noted in paragraph above.

11

29.   My investigation has determined that on or about May 9, 2024, the Peer

Assistance Committee terminated Robison from the PEER Assistance Program "for

default in complying with the program contract" and reported the termination to the

nursing board.

30.   On or about the same day, the Oklahoma Board of Nursing issued a

decision to revoke Robison's single-state registered nurse (RN) license and license as

an APRN, certified nurse practitioner (APRN-CNP) for two years. Robinson was

informed of this decision via first class mail addressed to 6314 E. 94th Place, Tulsa.

31.   At no time during her employment with Face & Body was Robison allowed

to engage in nursing practice that would involve attending to and consulting with

patients.

### Patient Interview

32.   On 03-20-2024, OBN Agents Willingham and Carnell drove to the Kum &

Go located at 11030 S. Elm St. in Jenks to meet with John McKinney, a patient of

Dr. Atkins. McKinney met agents in the Kum & Go parking lot at 1015 hours.

McKinney reported that he started going to Face & Body in July 2023, and never

had an encounter with Dr. Atkins, nor did he ever see him in the building.

McKinney stated that he went in for a consultation and had his blood drawn.

McKinney stated he was then called about his test results and was prescribed

Testosterone (Schedule III CDS). McKinney stated that he goes to Face & Body

every three months for lab work, and he always sees the "PA Mandy." My

investigation has determined that "PA Mandy" is Amanda Robison. McKinney's

Testosterone was written under Dr. Atkins' DEA number, but McKinney only interacted with "PA Mandy," (Robison) during each visit to Face & Body.

33.     My investigation has determined that during these appointments with McKinney, Robison did not possess a DEA License or an OBN Registration to prescribe any kind of scheduled II-V medication. Further, at the time McKinney was seeing Robison at the Face & Body facility, Robison was restricted in acting in a nursing role. Dr. Atkins, as her supervising Physician, was aware that she was not allowed to be acting in a provider role and should have been performing administrative duties only.

**Undercover Investigation**
**April 8, 2024 (UA Robertson)**

34.     On April 8, 2024, at 1450 hours, an undercover operation was conducted at Face & Body. OBN Undercover Agent ("UA") Robertson posed as a new patient seeking weight loss treatment. On April 3, 2024, UA Robertson called to make the appointment. On April 8, 2024, UA Robertson entered the clinic and notified the receptionist that she was there for the appointment. UA Robertson completed the new patient paperwork and presented an undercover Oklahoma driver's license. A clinic employee took UA Robertson to an exam room. After UA Robertson's vitals were taken, Robison entered the room. Robison asked UA Robertson her goal weight and if UA Robertson actually weighs 128 lbs. UA Robertson stated she did not really know her weight and that 128 lbs. was just guessing. UA Robertson told Robison that what she used to do just isn't working anymore as she gets older.

Robison asked UA Robertson about Phentermine and said that UA Robertson really didn't look like she needed to lose much weight. UA Robertson advised Robison that she wanted more of an appetite depressant, and she would go with Phentermine (a Schedule IV CDS). Robison asked if UA Robertson had ever used Phentermine before. UA Robertson stated she had not. Robison stated, "I'll see how you do on that because like I can refill it within the three months' time anytime. But that might be a strong dose for you, you may you know I don't know we'll see but you can even start out on a half a tab if you want, but it usually comes in a tab that's easy to break." Robison then took Agent Robertson's blood pressure. Robison directed UA Robertson to call if she had any issues with the Phentermine and if it didn't work, she would recommend the injections. UA Robertson checked out at the front desk and submitted payment for the appointment. UA Robertson handed the employee $125 of OBN Official Advanced Funds (OAF) and received a receipt. On April 17, 2024, UA Robertson retrieved the prescription for #30 Phentermine 37.5 mg from the Walgreens located at 5046 S. Sheridan Rd. in Tulsa. The Phentermine was sent to the Oklahoma State Bureau of Investigation (OSBI) for testing. The pills tested positive for Phentermine and the net weight was 6.09 grams. The prescription was packaged and is being held in evidence at the OBN Headquarters. Dr. Atkins' DEA number was used to E-scribe the medication. UA Robertson did not Dr. Atkins at any time during his visit.

### May 29, 2024 (UA Tello)

35.    On May 24, 2024, OBN Agent Tello working in an undercover capacity made a new patient appointment for weight loss at Face & Body. On May 29, 2024, UATello arrived at Face & Body at 1345 hours. UA Tello entered Face & Body and met with staff at the front counter to check in and fill out new patient paperwork. A female employee took UA Tello to an exam room where he waited. Another female employee arrived in the room and introduced herself as a nurse. She took UA Tello's blood pressure and weight. Once she obtained the readings, she informed UA Tello that "Mandy," was going to come in the room "shortly." My investigation has determined that "Mandy" referred to Amanda Robison. A short time later a female employee who introduced herself as "Mandy," (Robison) came into the room. Robison asked if UA Tello was there for weight loss. UA Tello replied yes. Robison asked if UA Tello wanted the weight loss injection or what he had in mind. UA Tello told Robison that he did not want the injection as he did not like needles but anything else would work. Robison stated, "Ok, so like a pill? Phentermine is really the only other thing I can think of outside of injection, which is a pill that's an appetite stimulant or a stimulant but it suppresses your appetite." At the end of the exam, UA Tello asked Robison if she is the doctor so that he could leave her an online review. Robison stated, "I'm the nurse practitioner, so I'll be the one prescribing, um so yeah, yup, and there's a doctor, um his name's Doctor Atkins, and he's um he's a D.O and he is here usually on Mondays and Thursdays, and he sees patients too, we both do. So, there's two people provider-wise that you can see."

Robison escorted UA Tello to the front desk where he paid for the office visit using

$125 dollars of OBN Official Advanced Funds (OAF). UA Tello exited the building.

On May 30, 2024, UA Tello received a text message from Dr. Ladd Atkin's office

with a link to rxinform.org indicating that his prescription for Phentermine Hcl

(Schedule IV CDS) was sent to Walgreens at 11332 E. 31st St. in Tulsa, Oklahoma.

On June 4, 2024, Undercover Agent Tello received a text message from Walgreens

that the prescription was ready to be picked up. The medication was picked up and

sent to OSBI for testing. The pills tested positive for Phentermine and the net weight

was 6.10 grams. The prescription was packaged and is being held in evidence at the

OBN Headquarters. Dr. Atkins' DEA number was used to E-Scribe the medication.

During his visit to the clinic, UA Tello did not see Dr. Atkins in the exam room or at

the premises.

### May 29, 2024 (UA Collins)

36.     On May 24, 2024, UA Collins acting in an undercover capacity made an

appointment at Face & Body located at 6304 E. 102nd St. Tulsa, Oklahoma for

weight loss. UA Collins was told that he would meet with Amanda Robison. On

May 29, 2024, at 1513 hours OBN UA arrived at Face & Body to purchase

Phentermine for weight loss. UA Collins met with staff at the front counter to check

in and fill out new patient paperwork. A short time later UA Collins was led back to

a consultation room. UA Collins waited in the consultation room for a short time

before an assistant entered the room and took UA Collins' blood pressure. The

assistant completed the blood pressure test and advised UA Collins that "Mandy"

would be in soon. A few minutes later a dark-haired female entered the room and stated, my name's Mandy the Nurse Practitioner. My investigation has determined that the person who saw UA Collins was Amanda Robison. UA Collins explained to Robison he was looking for something to lose weight. Robison and UA Collins discussed several weight loss options, but decided on a medication she called Phentermine (Schedule IV CDS). An attempt was then made to check UA Collin's blood pressure by another employee, and it was determined that UA Collins's pressure reading was high. Robison explained that she wanted to get a lower blood pressure reading before she could provide him with a prescription of Phentermine, because the side effects can cause elevated blood pressure. Robison left the room and a short time later, a female assistant came back into the room and took UA Collins' blood pressure again. Again, UA Collins' blood pressure was testing high. The assistant left the room. A few minutes later Robison returned to the room. Robison told UA Collins she wasn't comfortable prescribing the Phentermine until she got a lower blood pressure. UA Collins and Robison discussed him coming back the next day to take a blood pressure reading again. UA Collins agreed to come back the next day and try to get a lower blood pressure reading. UA Collins left the room and proceeded to the front desk to check out. UA Collins paid $125.00 of OBN OAF money for this visit. At 1618 hours UA Collins left the location. UA Collins did not see or speak with Dr. Atkins.

**May 30, 2024 (UA Collins)**

37.     On May 30, 2024 at 1145 hours, UA Collins returned to Face & Body to get

a second blood pressure test so that he could get a prescription of Phentermine. At

1147 hours, UA Collins spoke with the front desk and advised them that he was

there to complete a blood pressure test. UA Collins was taken back to the same

consultation room to get another blood pressure reading. After a few minutes

Robison entered the room. Robison took UA Collins' blood pressure, an it was low

enough to be prescribed Phentermine. After Robison took the blood pressure, she

stated, "But that's fine, I'll um I'll send your prescription for Phentermine, um which

remember they take it in the morning because it can affect your sleep, it's a

stimulant. UA Collins left the clinic. The Phentermine 37.5 mg was E-Scribed under

Dr. Atkins DEA number. On June 3, 2024, OBN Agent Jodi Willingham picked up

the Phentermine and sent it to OSBI for testing. The pills tested positive for

Phentermine and the net weight was 6.11 grams. The prescription was packaged and

is being held in evidence at the OBN Headquarters. Dr. Ladd Atkins did not see or

speak to UA Collins at either date during his visits to Face & Body.

**Additional Probable Cause Based on Training, Experience
and Knowledge of Narcotics Investigations**

38.     Based on my training and experience, as outlined above, and the facts and

circumstances of this Investigation, as well as consultations with experienced

narcotics investigators in the OBN and other agencies having extensive knowledge of

the practices of Physicians and Nurses, regarding the methods and practices of

18

individuals trafficking in or diverting pharmaceutical controlled substances, I know that:

a.   Medical professionals routinely maintain patient files in their offices where they see patients. Under Oklahoma state law and regulation, doctors are required to keep records of the controlled substance prescriptions they write and the controlled substances they dispense. From my training and experience, I know that doctors keep these types of patient records and controlled substance records in paper form, electronically on computers, or in other electronic formats. Okla. Admin. Code § 475:25-1-3 further provides that:

> A registered individual practitioner is required to maintain patient records for any individual receiving controlled dangerous substances whether by prescribing, administering, or dispensing.

39.   I believe that evidence of diversion within Face & Body will be found in the form of the following: controlled substances, United States currency, medical records (in any format including paper records and electronic records), sign-in sheets, charts, billing logs, payment records, prescriptions, patient files with fictitious documentation, dispensing logs, invoices, inventories, computers, computer servers, external hard drives, and other electronic storage devices, as described more particularly in Attachment "B", hereby incorporated by reference.

### Computers, Electronic Storage, and Forensic Analysis

40.   Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers accessing the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97 .178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from, and directed to, that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.  Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, flash memory, CD ROMs, and other magnetic or optical media.

41.   As described above and in Attachment "B", this application seeks permission to search for records that might be found on the Face & Body, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied

20

for would authorize the seizure of electronic storage media and electronically stored information, all under Rule 41 (e) (2) (B).

42.   Based on the nature of a medical practice, I believe that if a computer or storage medium is found at Face & Body, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of

21

how a computer has been used, what it has been used for, and who has used

it. To give a few examples, this forensic evidence can take the form of

operating system configurations, artifacts from operating system or

application operation; file system data structures, and virtual memory

"swap" or paging files. Computer users typically do not erase or delete this

evidence, because special software is typically required for that task.

However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

43.   As further described in Attachment "B", this application seeks permission to

locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes

how computers were used, the purpose of their use, who used them, and when.

There is probable cause to believe that this forensic electronic evidence will be on any

storage medium at Face & Body because:

a.   Data on the storage medium can provide evidence of a file that was once

on the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word

processing file). Virtual memory paging systems can leave traces of

information on the storage medium that show what tasks and processes were

recently active. Web browsers, e-mail programs, and chat programs store

configuration. information on the storage medium that can reveal

22

information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For

23

example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of

24

guilt (e.g., running a "wiping" program to destroy evidence on the computer
or password protecting/encrypting such evidence in an effort to conceal it
from law enforcement).

c.   A person with appropriate familiarity with how a computer works can,
after examining this forensic evidence in its proper context, draw conclusions
about how computers were used, the purpose of their use, who used them,
and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or
other forms of forensic evidence on storage medium that are necessary to
draw an accurate conclusion is a dynamic process. While it is possible to
specify in advance the records to be sought, computer evidence is not always
data that can be merely reviewed by a review team and passed along to
investigators. Whether data stored on a computer is evidence may depend on
other information stored on the computer and the application of knowledge
about how a computer behaves. Therefore, contextual information necessary
to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of
its use, who used it, and when, sometimes it is necessary to establish that a
particular thing is not present on a storage medium. For example, the
presence or absence of counter-forensic programs or anti-virus programs
(and associated data) may be relevant to establishing the user's intent.

44. In most cases, a thorough search of a premise for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different

26

ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

45.   Based on the foregoing, I am seeking the courts authorization to seize, image, or otherwise copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## Conclusion

46.   As set forth in this affidavit, probable cause exists to believe that Amanda Robison, Dr. Ladd Atkins, and other Face & Body employees are involved in prescribing medication, in particular scheduled controlled substances, without a

legitimate medical purpose to facilitate the diversion of controlled substances outside

the scope of standard care for a medical professional. I believe probable cause exists

that Amanda Robison attended to multiple patients while being unable to do so as an

RN or APRN. Specifically, probable cause exists to believe that individuals

associated with Face & Body violated various federal drug trafficking laws, including

21 U.S.C. § 841 – Distribution of Controlled Substances. In addition, probable cause

exists to believe that evidence, fruits, and instrumentalities of the above-described

violations will be found during the search of Face & Body.

John Morrison, Captain
Oklahoma Bureau of Narcotics
TFO HSI

Subscribed and sworn to before me ~by telephone~ this 11th day of October, 2024.

Susan E. Huntsman
United States Magistrate Judge

28

## ATTACHMENT A

### Property to be Searched

The property to be searched is at Face & Body, 6304 East 102nd Street Tulsa, OK

74137. The clinic is in a beige commercial building, with rock on the bottom portion

of the building, and it has multiple windows and a dark brown roof. The building is

in a medical complex in the far southwest corner, off of the corner of Sheridan and

101st Street, in Tulsa, Oklahoma. Affixed in black letters on the right side of the front

door is the number 6304. On the northeast corner of the property to the side of the

front of the building is a sign that says "Face & Body," and in small letters under the

word "Body" the sign says Medical Aesthetics & Cosmetic Surgery, and under that it

says Dr. Ladd Atkins, D.O.



## ATTACHMENT B

### Items to be Seized from Premises

The items to be seized are the following, which constitute evidence, fruits, and instrumentalities of violations of Title 21 United States Code, Sections 841 (a)(l) (unlawful distribution of controlled substances), and846 (conspiracy to unlawfully distribute controlled substances), dated from July 1, 2023, to June 30, 2024:

1.   Documents constituting, concerning, or relating to patient files and related clinic records; electronic patient files, scheduling documentation, prescription pads, patient sign in sheets, daily dispensing logs, daily logs, any forms signed by patients, patient testing orders and testing reports used or obtained in patient care, appointment notes, procedure notes, physicians' orders, communication notes, assessments, insurance precertification's, follow-up assessments, discharge assessments, other patient assessments, medication profiles, consent forms, office compliance reviews, clinical records reviews, clinical licenses and certifications, correspondences, patient progress notes, and patient visit logs/sign-in sheets.

2.   Any invoices, order forms, credit memos, or any other documents related to the purchase, return or dispensation of controlled substances.

3.   Any executed DEA Forms 222 and Order Forms used to purchase Scheduled controlled substances.

4.   Personnel and payroll files and records, including records listing names, addresses, duration of employment, and pay schedules; work schedules, time sheets, appointment books, employees notes or summaries, and other records showing the

services provided by and all payments made to or for nurses, nurse aids, physicians, and other persons providing medical services.

5.   Corporate and business records, articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property records, ownership, corporate structure, control and ownership.

6.   Tax records, bills, billing records, cash receipt books, booking ledgers, investment or retirement account statements, or other items evidencing the acquisition, secreting, transfer, storage, concealment, and/or expenditure of money, assets, wealth, or other items of value which are used, or intended to be used, as the proceeds of, or to facilitate the illegal diversion of controlled substances.

7.   Bank and brokerage account monthly statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets, and records of transfer.

8.   Invoices, purchase orders, credit card information, wire transfers, payments, account statements, investment records and postal mailing records.

9.   Calendars, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, personal digital assistants (PDAs), emails, and address books.

10.   Any and all telephone records, written correspondence, or emails to, from, or between the owners or employees. Any correspondence, including transmissions by text message, facsimile and stored e-mail, exchanged between or involving any of the clinic employees, agents, or representatives located in the clinic.

11.   Any information described in the proceeding paragraphs stored in electronic or magnetic media, electronic data processing and storage devices, computers and computer systems, including central processing units, internal and peripheral diskettes, tape drives and tapes, optical storage devices such as CD/DVD/Blu-Ray, including the video/audio recordings recorded on the office's recently installed video/audio system, together with system documentation, operating logs and documentation, software and instruction manuals. Any and all records showing or bearing indicia of the use, ownership, possession or control of the computer equipment, accessories, telephone(s), and modem(s). Any and all tapes, cassettes, hardware, computer disks, data disks, magnetic media, CD ROM disks, mobile devices, smart phones, tape systems, optical data storage media, hard disks, thumb drives, network attached storage, cellular telephones, and other computer relationship operational equipment.

12.   Any FOB, medallion, token or electronic device used to facilitate the E-Scribe of medications.

3